T.C. Memo. 1996-558


UNITED STATES TAX COURT


MARK FRIEDMAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

DAVID AND DEBORAH B. ALTER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 24753-88, 6302-89.    Filed December 26, 1996.


<u>Stuart A. Smith</u> and <u>David H. Schnabel</u>, for petitioners in docket Nos. 24753-88 and 6302-89.

<u>Jennifer J. Kohler</u>, <u>Elizabeth A. Maresca</u>, and <u>Frances Ferrito Regan</u>, for respondent in docket No. 24753-88.

<u>Donald A. Glasel</u>, <u>Mitchell Hausman</u>, <u>Jennifer J. Kohler</u>, and <u>Frances Ferrito Regan</u>, for respondent in docket No. 6302-89.

CONTENTS

Page

MEMORANDUM FINDINGS OF FACT AND OPINION........................ 2
OPINION OF THE SPECIAL TRIAL JUDGE............................. 3
FINDINGS OF FACT.............................................. 6
    A. The Plastics Recycling Transactions...................... 6
    B. The Partnerships......................................... 8
    C. Petitioners and Their Introduction to the Partnership
       Transactions.........................................10
       1.   Mark Friedman........................................10
       2.   David and Deborah B. Alter..........................14
OPINION......................................................21
    A. Section 6653(a)--Negligence.............................24
       1.   The Private Offering Memoranda......................26
       2.   The So-Called Oil Crisis............................31
       3.   Petitioners' Purported Reliance on Advisers.........35
       4.   Miscellaneous.......................................50
       5.   Conclusion as to Negligence.........................57
    B. Section 6659--Valuation Overstatement...................58
       1.   The Grounds for Petitioners' Underpayments..........59
       2.   Concession of the Deficiencies......................64
       3.   Section 6659(e)......................................68
    C. Petitioners' Motions For Leave To File Motion For
       Decision Ordering Relief From the Negligence Penalty and
       the Penalty Rate of Interest and To File Supporting
       Memoranda of Law....................................73

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, _Judge_: These cases were assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. They were tried and briefed separately but consolidated for purposes of opinion. All section references are to the Internal Revenue Code in effect for the tax year in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge: These cases are part of the Plastics Recycling group of cases. For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993). The facts of the underlying transactions and the Sentinel recyclers in these cases are substantially identical to those considered in the Provizer case.

In a notice of deficiency dated July 7, 1988, respondent determined a deficiency in petitioner Friedman's 1981 Federal income tax in the amount of $14,275, plus additions to tax in the amount of $4,283 under section 6659 for valuation overstatement, in the amount of $714 under section 6653(a)(1) for negligence, and under section 6653(a)(2) in the amount of 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence. Respondent also determined that interest on the deficiency accruing after December 31, 1984, would be calculated at 120 percent of the statutory rate under section 6621(c).

In a notice of deficiency dated January 19, 1989, respondent determined a deficiency with respect to the joint Federal income tax return filed by David and Deborah B. Alter (petitioners Alter) for 1981 in the amount of $27,575, plus additions to tax in the amount of $8,272.50 under section 6659 for valuation

overstatement, in the amount of $1,378.75 under section 6653(a)(1) for negligence, and under section 6653(a)(2) in the amount of 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence. Respondent also determined that interest on the deficiency accruing after December 31, 1984, would be calculated at 120 percent of the statutory rate under section 6621(c). In a stipulation of settled issues filed August 8, 1990, petitioners Alter conceded the disallowance of a real estate office rent deduction claimed on their 1981 return in the amount of $3,320.

The parties in each of these consolidated cases filed Stipulations of Settled Issues concerning the adjustments relating to petitioners' participation in the Plastics Recycling Program. The stipulations provide:

1. Petitioners are not entitled to any deductions, losses, investment credits, business energy investment credits or any other tax benefits claimed on their tax returns as a result of their participation in the Plastics Recycling Program.

2. The underpayments in income tax attributable to petitioners' participation in the Plastics Recycling Program are substantial underpayments attributable to tax-motivated transactions, subject to the increased rate of interest established under I.R.C. §6621(c), formerly §6621(d).

3. This stipulation resolves all issues that relate to the items claimed on petitioners' tax returns resulting from their participation in the Plastics Recycling Program, with the exception of petitioners' potential liability for additions to the tax for valuation overstatements under I.R.C. §6659 and for negligence under the applicable provisions of §6653(a).

Long after the trials of these cases, petitioners each filed a Motion For Leave To File Motion For Decision Ordering Relief From the Negligence Penalty and the Penalty Rate of Interest and To File Supporting Memorandum of Law under Rule 50. These motions were filed with attached exhibits on October 20, 1995, in the Friedman case, and on November 13, 1995, in the Alter case. On those same dates, petitioners each also lodged with the Court a motion for decision ordering relief from the additions to tax for negligence and the increased rate of interest, with attachments, and a memorandum in support of the motion. Subsequently, respondent filed objections, with attachments, and memoranda in support thereof, and petitioners thereafter filed reply memoranda. For reasons discussed in more detail at the end of this opinion, and also in Farrell v. Commissioner, T.C. Memo. 1996-295, these motions shall be denied. See also Gollin v. Commissioner, T.C. Memo. 1996-454; Grelsamer v. Commissioner, T.C. Memo. 1996-399; Zenkel v. Commissioner, T.C. Memo. 1996-398.

The issues remaining in these consolidated cases are: (1) Whether petitioners are liable for the additions to tax for negligence under section 6653(a)(1) and (2); and (2) whether petitioners are liable for additions to tax under section 6659 for underpayments of tax attributable to valuation overstatements.

FINDINGS OF FACT

Some of the facts have been stipulated in each case and are so found. The stipulated facts and attached exhibits are incorporated in the respective cases by this reference.

A. The Plastics Recycling Transactions

These cases concern petitioners' investments in two limited partnerships that leased Sentinel expanded polyethylene (EPE) recyclers: Clearwater Group (Clearwater) and Poly Reclamation Associates (Poly Reclamation). Petitioner Friedman is a limited partner in Clearwater, and petitioners Alter are limited partners in Poly Reclamation. For convenience, we refer to these partnerships collectively as the Partnerships.

The Clearwater partnership, and the transactions involving the Sentinel EPE Recyclers leased by Clearwater, were considered in Provizer v. Commissioner, supra. The transactions involving the Sentinel EPE recyclers leased by Poly Reclamation are substantially identical to the Clearwater transactions. Petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in the Provizer case.

In the Provizer case, Packaging Industries, Inc. (PI), manufactured and sold six Sentinel EPE recyclers to ECI Corp. for $981,000 each. ECI Corp., in turn, resold the recyclers to F & G

Corp. for $1,162,666 each. F & G Corp. then leased the recyclers to Clearwater, which licensed the recyclers to FMEC Corp., which sublicensed them back to PI. The sales of the recyclers from PI to ECI Corp. were financed with nonrecourse notes. Approximately 7 percent of the sales price of the recyclers sold by ECI Corp. to F & G Corp. was paid in cash with the remainder financed through notes. These notes provided that 10 percent of the notes were recourse but that the recourse portion of the notes was only due after the nonrecourse portion, 90 percent, was paid in full.

All of the monthly payments required among the entities in the above transactions offset each other. These transactions were done simultaneously. Although the recyclers were sold and leased for the above amounts under the structure of simultaneous transactions, the fair market value of a Sentinel EPE recycler in 1981 was not in excess of $50,000.

PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap. The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC Corp. based on the quality and amount of recycled scrap.

Like Clearwater, Poly Reclamation leased Sentinel EPE recyclers from F & G Corp. and licensed those recyclers to FMEC Corp. Apart from the entity that leased the machines from F & G

Corp. and licensed them to FMEC Corp., the transactions of the Partnerships do not differ in any substantive respects.

For convenience, we refer to the series of transactions among PI, ECI Corp., F & G Corp., each of the Partnerships, FMEC Corp., and PI as the Partnership transactions. In addition to the Partnership transactions, a number of other limited partnerships entered into transactions similar to the Partnership transactions, also involving Sentinel EPE recyclers and Sentinel expanded polystyrene (EPS) recyclers. We refer to these collectively as the Plastics Recycling transactions.

B. The Partnerships

Clearwater and Poly Reclamation are New York limited partnerships. Poly Reclamation and Clearwater each closed during the latter few months of 1981. Samuel L. Winer (Winer) is the general partner of both Clearwater and Poly Reclamation.

With respect to each of the Partnerships, a private placement memorandum was distributed to potential limited partners. Reports by F & G Corp.'s evaluators, Dr. Stanley M. Ulanoff (Ulanoff), a marketing consultant, and Dr. Samuel Z. Burstein (Burstein), a mathematics professor, were appended to the offering memoranda. Ulanoff owns a 1.27-percent interest in Plymouth Equipment Associates and a 4.37-percent interest in Taylor Recycling Associates, partnerships that leased Sentinel

recyclers. Burstein owns a 2.605-percent interest in Empire Associates and a 5.82-percent interest in Jefferson Recycling Associates, also partnerships that leased Sentinel recyclers. Burstein also was a client and business associate of Elliot I. Miller (Miller), the corporate counsel to PI.

Each of the offering memoranda for Clearwater and Poly Reclamation states that the general partner will receive fees from the partnership in the amount of $60,000. In addition, each of the offering memoranda provides that the general partner "may retain as additional compensation all amounts not paid as sales commissions or offeree representative fees". According to the offering memoranda, 10 percent of the proceeds from each offering were allocated to the payment of sales commissions and offeree representative fees.

The offering memoranda list significant business and tax risk factors associated with investments in the Partnerships. Specifically, the offering memoranda state: (1) There is a substantial likelihood of audit by the Internal Revenue Service (IRS) and the purchase price paid by F & G Corp. to ECI Corp. probably will be challenged as being in excess of fair market value; (2) the Partnerships have no prior operating history; (3) the general partner has no prior experience in marketing recycling or similar equipment; (4) the limited partners have no

control over the conduct of the Partnerships' business; (5) there is no established market for the Sentinel EPE recyclers; (6) there are no assurances that market prices for virgin resin will remain at their current costs per pound or that the recycled pellets will be as marketable as virgin pellets; and (7) certain potential conflicts of interest exist.

C.  Petitioners and Their Introduction to the Partnership Transactions

### 1.  Mark Friedman

Petitioner Mark Friedman (Friedman) resided in New York, New York, when his petition was filed.  Friedman was a member of Phi Betta Kappa and graduated magna cum laude from the University of Pennsylvania in 1970 with a B.A. degree in history.  He then attended the University of Pennsylvania Law School and became the articles editor of its law review.  After his graduation from law school in 1973, Friedman became employed by the law firm of Simpson, Thatcher & Bartlett in New York City.  Four years later he became employed by the law firm of Shea & Gould, also in New York City, and became a partner of that firm on January 1, 1982. Friedman specializes in corporate and Federal securities law.  He has represented issuers and underwriters in both public and private offerings of securities.  One of his primary functions has been drafting prospectuses and offering circulars.

By 1981 Friedman was very familiar with the typical content of a prospectus or private offering memorandum. In addition to his professional experience, Friedman has been an active investor since 1973. From 1973 to 1981 Friedman invested in a "great number" of publicly traded stocks and private placements. His approach to those investments was thorough and methodical: Friedman read the prospectus or private offering memorandum, spoke to an expert in the pertinent industry, investigated the risk factors described in the offering materials, consulted industry reports, and spoke to other active investors or lawyers. Friedman is "sophisticated enough to know that in any tax investment the underlying economics have to be legitimate."

In 1981 Friedman acquired a 1.547-percent[1] interest in Clearwater for $12,500. As a result of his investment in Clearwater, on his 1981 Federal income tax return Friedman claimed an operating loss in the amount of $10,002. Of a total of $21,584 in investment tax and business energy credits,

---

[1] The parties stipulated that Friedman owned 25 percent of the profits, losses, and capital of Clearwater during taxable year 1981. However, Friedman's 1981 Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., attached to Clearwater's 1981 partnership return, reports that he owned a 1.547-percent interest in Clearwater.

Friedman used $9,290 on his 1981 return.[2]  Respondent disallowed

Friedman's claimed operating loss and investment credit flowing

from Clearwater.[3]

Friedman was told about the Plastics Recycling transactions

by several partners at Shea & Gould.  Approximately eight

partners contemplated investing in a Plastics Recycling

transaction.  Friedman understood that Stuart Hirshfield

(Hirshfield), a bankruptcy specialist at Shea & Gould, previously

had done business with Winer and thought well of him.  Hirshfield

and two other partners, Dan Carroll (Carroll) and Lonn Trost

(Trost), each made inquiries about some aspects of the Plastics

Recycling transactions.  Friedman also understood that Trost and

Hirshfield visited PI at least once and viewed some Sentinel EPE

recyclers.  Alan Parker (Parker), a tax partner, reviewed the tax

---

[2]     Friedman's basis in the Clearwater Sentinel EPE recyclers
was $107,918.  He had a basis in other property qualifying for
the investment tax credit in the amount of $3,211.  Friedman's
tentative investment tax and business energy credits flowing from
Clearwater each totaled $10,792.  However, Friedman's business
energy credit was subject to a limitation in the amount of zero,
and his regular investment credit was subject to a limitation in
the amount of $9,611.  Of the total investment credit claimed in
1981 by Friedman, $9,290 was from Clearwater and $321 was from
other qualifying property.  The record in docket No. 24753-89
does not disclose whether Friedman carried forward or back his
unused credits.

[3]     Respondent allowed $321 in investment tax credits related to
other property not at issue herein.

benefits and indicated that they were supportable, provided "that from a business point of view this was a good economic investment". Friedman decided to invest in Clearwater after reading the offering memorandum and discussing the investment with his colleagues at Shea & Gould. He also provided a copy of the offering memorandum to his accountant. The accountant had no experience in plastics or plastics recycling, and did not independently investigate the plastics industry or the Sentinel EPE recycler.

Friedman does not have any education or experience in engineering, plastics materials, or plastics recycling. He understood that Carroll had a background in engineering and that another partner, Joseph Ferraro (Ferraro), may have had some experience in his past with plastics. Friedman did not see a Sentinel EPE recycler, investigate the uniqueness of the machine, investigate whether the value placed on the recycler was bona fide, or investigate whether there were any other machines that were designed to recycle low density polyethylene. He did not do any type of cash flow analysis or check any of the figures in the offering memorandum. Friedman did not personally investigate PI. He did not ask whether the technology for the Sentinel EPE recycler was patented or inquire whether there were any suitable end-users for the recyclers. He did not review any periodicals

relating to resin prices. He never made a profit in any year from his investment in Clearwater.

2.  David and Deborah B. Alter

Petitioners David and Deborah B. Alter resided in New York, New York, at the time their petition was filed. David Alter (Alter) graduated from the Harvard Law School and has been practicing law since 1950. Alter has been a member of several law firms since 1954: From 1954 to 1966 he was a partner at the law firm of Squadron, Alter & Weinrib; from 1966 to 1979 he was a partner of the law firm of Alter, LeFevre, Raphael & Lowry (Alter, LeFevre);[4] and from 1979 to 1989 he was a partner at the law firm of Shea & Gould. Alter is a general practitioner with a concentration in entertainment and labor law. Among the services he provided to his clients were the preparation and review of contracts, general tax advice, estate planning, and administering and maintaining financial records. On occasion, Alter's entertainment clients asked him to review offering materials for investment opportunities that they had learned of elsewhere. In

---

[4]    Alter, LeFevre underwent several name changes during Alter's tenure as a partner. Apparently, Alter, LeFevre, Raphael & Lowry was the name of the firm by 1978. For convenience, references to "Alter, LeFevre" include its predecessor names while Alter was a partner.

the course of his practice, Alter advised his clients whether to consider such investments.

Alter acquired a 1.547-percent interest in Poly Reclamation for $12,500 in 1981.  As a result of his investment in Poly Reclamation, on their joint 1981 Federal income tax return Alter and his wife Deborah claimed an operating loss in the amount of $9,976, and investment tax and business energy credits totaling $21,584.[5]  Respondent disallowed the Alters' claimed operating loss and investment tax and business energy credits flowing from Poly Reclamation.

Alter learned of the Plastics Recycling transactions from Hirshfield, who in turn had been introduced to the transactions by Winer.  Alter understood that Hirshfield previously had done business with Winer and thought well of him.  Alter read the Poly Reclamation offering memorandum and attended some meetings with other Shea & Gould partners who were considering an investment in the Plastics Recycling transactions, including Hirshfield, Carroll, Ferraro, Trost, and Parker.  He understood that Carroll had a background in engineering, and that Ferraro, who at the time represented British Petroleum, had worked at a plastics

---

[5]    Alter and his wife claimed an additional $1,046 in regular investment credits from other qualifying property on their 1981 return.

company for one or more summers during and prior to law school. Martin Feinstein (Feinstein), an associate at Shea & Gould, also reviewed the Plastics Recycling transactions for Alter and some of Alter's clients.

Feinstein has a B.A. in economics from Brooklyn College and graduated cum laude from the New York University School of Law. He is a member of the New York State bar and during 1981 he also was a certified public accountant (C.P.A.). Feinstein earned the credits that enabled him to sit for the C.P.A. exam from New York University. During law school, and for a time afterward, Feinstein worked at an accounting firm. He then joined a business management company, Vincent Andrews, Inc. (VAI). VAI managed the finances of people primarily in the entertainment and theatrical industry. Feinstein specialized in tax matters and budgeting at VAI. He and Alter met in 1969 through a VAI client, Bill Cullen, who at the time also was represented by Alter in a tax matter. Feinstein subsequently joined Alter, LeFevre sometime in 1969.[6]

Feinstein continued to advise persons regarding financial and tax matters at Alter, LeFevre. The firm provided a variety

---

[6] At trial, Feinstein recalled that at the time he joined Alter, LeFevre, the name of the firm was Pross, Halpern, Smith. Alter's posttrial brief indicates that the firm's name at that time was Pross, Smith, Halpern & LeFevre.

of financial services to its clients.  For some clients, it maintained checking accounts, paid bills, and prepared weekly statements showing the client's opening balance, deposits, withdrawals, and expenditures.  On January 1, 1979, Alter, LeFevre merged with another law firm, Aranow & Brodsky, but the resulting firm ceased operations by Labor Day of that year, and that same month Alter and Feinstein joined Shea & Gould.

In the fall of 1981, Alter asked Feinstein to review the Plastics Recycling transactions as a potential investment for Alter and some of his clients.  Feinstein received a copy of the Poly Reclamation offering memorandum from Winer.  He spent approximately 4 to 6 hours reviewing it, including the financial projections and the tax opinion.  Feinstein understood that Hirshfield and Ferraro had spoken to members of the law firm that drafted the tax opinion, and that they and Trost were satisfied with the opinion.  He also understood that "someone asked one of the tax partners to look at the thing in general", but he did not know "how much detail * * * [Shea & Gould] did."  Although Alter claimed that he asked Feinstein "to check with the tax partner in the firm, Alan Parker", Feinstein did not speak with Parker.

Feinstein relied on the offering memorandum for the value of the Sentinel EPE recycler.  He understood that the purported value of the Sentinel EPE recycler was based upon a projected

stream of future income. Feinstein did not verify the manufacturing cost of a Sentinel EPE recycler beyond speaking with a friend and associate,[7] "about pricing and how things are priced in that industry." He understood from his friend that the stream-of-income method of valuation was not an unusual means of pricing equipment. Feinstein reviewed the stream of income projections in the offering memorandum, but did not verify any of the assumptions upon which they were based. He did not research or investigate the market for plastics recyclers or recycled resin pellets.

Feinstein spoke to a friend, Jerry Lauren (Lauren), who was a manufacturer's representative in the plastics packaging industry. He understood from Lauren that PI was a privately owned company that made specialized machinery for companies involved in the packaging industry. Feinstein did not formally hire or pay Lauren. He did not provide Lauren with a copy of the Poly Reclamation offering memorandum. Lauren did not prepare a written report for Feinstein. Feinstein "never asked * * * [Lauren] anything about the partnership". He only asked Lauren what he knew about PI. Feinstein did not ask Lauren, or anyone

---

[7] Feinstein did not state who this friend and associate was or what his or her credentials were.

else, whether any plastics recycling machines comparable to the Sentinel machines already were available on the market.

Feinstein has no education or experience in plastics materials or plastics recycling, and he was not under the impression that Hirshfield, Trost, or Ferraro had any education or experience in the plastics industry. He did not visit PI and there is no indication in the record in docket No. 6302-89 that Feinstein ever saw a Sentinel EPE recycler. Feinstein did not review any marketing plans or research the market for plastics recyclers or recycled ground resin pellets. He was unaware that the Sentinel EPE recycler was incapable of recycling expanded polyethylene by itself, and had to be used in connection with grinders, extruders, and pelletizers. Feinstein did not know how many other partnerships would be leasing Sentinel recyclers.

Feinstein told Alter about Lauren and his comments about PI. Alter knew that Lauren and Feinstein had not visited PI, or investigated whether competitive machines existed, or made a judgment as to the value of a Sentinel EPE recycler. He also knew that neither Feinstein nor Lauren personally invested in a Plastics Recycling transaction. Alter accepted the fair market value of the Sentinel EPE recycler as set out in the offering memorandum. He had "no competence to" confirm the value of the machines or "to do any comparison", and he did not hire anyone to

value the machine.  Like Feinstein, Alter did not know that the Sentinel EPE recycler did not recycle plastic by itself but had to be used in connection with other machines.  Alter did not review any plastics industry trade journals for competing recyclers or otherwise inquire as to whether there were any comparable machines already on the market.

Alter told at least four of his clients that he was investing in a Plastics Recycling transaction and that the investment was open to them as well.  He told them that he and other members of Shea & Gould thought that the investment seemed sound.  Feinstein and Alter met with these clients and explained the details of the investment.  Alter did not advise his clients to read the offering memorandum, but it was available for them to read.  He did not suggest that they consult with any plastics experts.  At least four of Alter's clients, as well as Alter, invested in a plastics Recycling transaction in 1981.  Alter and those same four clients invested in another Plastics Recycling transaction in 1982.

Alter and his wife Deborah have no education or work experience in plastics materials or plastics recycling.  Prior to investing in the Plastics Recycling transactions, Alter did not know anything about the business of PI and had not seen a Sentinel EPE or EPS recycler.  His knowledge of PI was limited to

the information in the offering materials and what Feinstein told
him.  The warnings and caveats in the offering memorandum did not
concern him.  Alter never asked whether there were any comparable
machines already on the market, and he was unaware of any
companies that would be suitable end-users for the recyclers.  He
knew that Feinstein did not have any expertise in plastics
materials or plastics recycling.  Alter and his wife Deborah
never made a profit from their participation in Poly Reclamation.

OPINION

We have decided a large number of the Plastics Recycling
group of cases.[8]  The majority of these cases, like the present

---

[8]     Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without
published opinion 996 F.2d 1216 (6th Cir. 1993), concerned the
substance of the partnership transaction and also the additions
to tax.
    The following cases concerned the addition to tax for
negligence, inter alia:  Becker v. Commissioner, T.C. Memo. 1996-
538; Jaroff v. Commissioner, T.C. Memo. 1996-527; Gollin v.
Commissioner, T.C. Memo. 1996-454; Grelsamer v. Commissioner,
T.C. Memo. 1996-399; Zenkel v. Commissioner, T.C. Memo. 1996-398;
Estate of Busch v. Commissioner, T.C. Memo. 1996-342; Spears v.
Commissioner, T.C. Memo. 1996-341; Stone v. Commissioner, T.C.
Memo. 1996-230; Reimann v. Commissioner, T.C. Memo. 1996-84;
Bennett v. Commissioner, T.C. Memo. 1996-14; Atkind v.
Commissioner, T.C. Memo. 1995-582; Triemstra v. Commissioner,
T.C. Memo. 1995-581; Pace v. Commissioner, T.C. Memo. 1995-580;
Dworkin v. Commissioner, T.C. Memo. 1995-533; Wilson v
Commissioner, T.C. Memo. 1995-525; Avellini v. Commissioner, T.C.
Memo. 1995-489; Paulson v. Commissioner, T.C. Memo. 1995-387;
Zidanich v. Commissioner, T.C. Memo. 1995-382; Ramesh v.
Commissioner, T.C. Memo. 1995-346; Reister v. Commissioner, T.C.
Memo. 1995-305; Fralich v. Commissioner, T.C. Memo. 1995-257;
(continued...)

cases, raised issues regarding additions to tax for negligence and valuation overstatement. We have found the taxpayers liable for the additions to tax in all but one of the opinions to date on these issues, although procedural rulings have involved many more favorable results for taxpayers.[9]

---

[8](...continued)
Shapiro v. Commissioner, T.C. Memo. 1995-224; Pierce v. Commissioner, T.C. Memo. 1995-223; Fine v. Commissioner, T.C. Memo. 1995-222; Pearlman v. Commissioner, T.C. Memo. 1995-182; Kott v. Commissioner, T.C. Memo. 1995-181; Eisenberg v. Commissioner, T.C. Memo. 1995-180.

Greene v. Commissioner, 88 T.C. 376 (1987), concerned the applicability of the safe-harbor leasing provisions of sec. 168(f)(8). Trost v. Commissioner, 95 T.C. 560 (1990), concerned a jurisdictional issue.

Farrell v. Commissioner, T.C. Memo. 1996-295; Baratelli v. Commissioner, T.C. Memo. 1994-484; Estate of Satin v. Commissioner, T.C. Memo. 1994-435; Fisher v. Commissioner, T.C. Memo. 1994-434; Foam Recycling Associates v. Commissioner, T.C. Memo. 1992-645; Madison Recycling Associates v. Commissioner, T.C. Memo. 1992-605, concerned other issues.

[9]    In Zidanich v. Commissioner, T.C. Memo. 1995-382, we held the taxpayers liable for the sec. 6659 addition to tax, but not liable for the negligence additions to tax under sec. 6653(a). As indicated in our opinion, the Zidanich case, and the Steinberg case consolidated with it for opinion, involved exceptional circumstances.

In Estate of Satin v. Commissioner, supra, and Fisher v. Commissioner, supra, after the decision in Provizer v. Commissioner, supra, the taxpayers were allowed to elect to accept a beneficial settlement because of exceptional circumstances. In Farrell v. Commissioner, supra, we rejected the taxpayers' claim to a similar belated settlement arrangement since the circumstances were different and the taxpayers previously had rejected settlement and elected to litigate the case. See also Zenkel v. Commissioner, supra; Baratelli v. Commissioner, supra.

In Provizer v. Commissioner, T.C. Memo. 1992-177, a test case for the Plastics Recycling group of cases, this Court (1) found that each Sentinel EPE recycler had a fair market value not in excess of $50,000, (2) held that the Clearwater transaction was a sham because it lacked economic substance and a business purpose, (3) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers, and (4) held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated transactions within the meaning of section 6621(c).  In reaching the conclusion that the transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers.

Although petitioners have not agreed to be bound by the Provizer opinion, the Clearwater transaction was considered in Provizer v. Commissioner, supra, and the Alters stipulated that the Poly Reclamation transaction is substantially identical to the Clearwater transaction.  The underlying transactions in these cases, and the Sentinel EPE recyclers purportedly leased by the Partnerships, are the same type of transaction and same type of machines considered in Provizer v. Commissioner, supra.

Based on the entire records in these cases, including the extensive stipulations, testimony of respondent's experts, and petitioners' testimony, we hold that each of the Partnership transactions herein was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Respondent is sustained on the question of the underlying deficiencies. We note that petitioners have explicitly conceded this issue in the stipulations of settled issues filed shortly before trial. The records plainly support respondent's determinations regardless of such concessions. For a detailed discussion of the facts and the applicable law in a substantially identical case that also involved Clearwater, see Provizer v. Commissioner, supra.

A.  Section 6653(a)--Negligence

In notices of deficiency, respondent determined that each of petitioners was liable for the additions to tax for negligence under section 6653(a)(1) and (2) for 1981. Petitioners have the burden of proving that respondent's determinations of these additions to tax are erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or

regulations. Section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.

Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). When considering the negligence addition to tax, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers, as well as the manner in which they approached their investment. McPike v. Commissioner, T.C. Memo. 1996-46. Compare Spears v. Commissioner, T.C. Memo. 1996-341 with Zidanich v. Commissioner, T.C. Memo. 1995-382.

Petitioners argue that they were reasonable in claiming deductions and credits with respect to the Partnerships. They maintain that they carefully read the respective offering memoranda, expected an economic profit in light of the so-called oil crisis in the United States in 1981, and that they reasonably

relied upon their colleagues at Shea & Gould as qualified advisers on this matter.

### 1.  The Private Offering Memoranda

Friedman and Alter each testified that they read the respective offering memoranda.  Their testimony and actions, however, indicate that they did not give due consideration to all of the information set out in the offering memoranda, and that they ultimately did not place a great deal of reliance, if any, on the representations therein.

The offering memoranda raised numerous caveats and warnings with respect to the Partnerships, including:  (1) The Partnerships had no operating history; (2) management of the Partnerships' business was dependent upon the general partner, who had no experience in marketing recycling equipment and who was required to devote only such time to the Partnerships as he deemed necessary; (3) the limited partners had no right to take part in, or interfere in any manner with, the management or conduct of the business of the Partnerships; (4) there was no established market for the Sentinel recyclers; and (5) although competitors purportedly were not marketing comparable equipment, and the Sentinel recyclers purportedly involved "carefully guarded trade secrets," PI did "not intend to apply for a patent for protection against appropriation and use by others."

Friedman testified that he was an active investor from 1973 to 1981, and that it was his established practice to read the accompanying prospectus or offering memorandum and investigate the risks that were described therein. With respect to Clearwater, however, Friedman did not investigate the risks described in the offering memorandum or even seek to verify the purported value or uniqueness of a Sentinel EPE recycler. Alter testified that he was not concerned by the risk factors described in the Poly Reclamation offering memorandum, and commented that he had "seen similar disclaimers in other red herrings or offering memoranda." Asked what he did to confirm the value of the machine, Alter testified "I had no competence to do that, to do any comparison." Alter did not hire an expert to value the Sentinel EPE recycler, and he knew that Feinstein and Lauren had not made a judgment as to the value of the machine. The records in these cases do not reflect a careful and studied consideration of the offering memoranda by either petitioner.

The projected tax benefits in the Clearwater and Poly Reclamation offering memoranda exceeded petitioners' investments. According to the Clearwater and Poly Reclamation offering memoranda, for each $50,000 investor, the projected first-year tax benefits were investment tax credits in the amount of $86,328 for each partnership, plus deductions in the amounts of $39,399

and $39,162, respectively. For his $12,500 investment in Clearwater, Friedman claimed an operating loss in the amount of $10,002, and investment tax and business energy credits in the amount of $9,290[10] on his 1981 return. As a result of Alter's $12,500 investment in Poly Reclamation, on their 1981 return he and his wife Deborah claimed an operating loss in the amount of $9,976 and investment tax and business energy credits totaling $21,584.

The investment tax and business energy credits generated by the Partnerships and available to petitioners equaled 173 percent of their cash investments. Therefore, after adjustments of withholding, estimated tax, or final payment, and possible carryback or carryover in Friedman's case, like the taxpayers in Provizer v. Commissioner, T.C. Memo. 1992-177, "except for a few weeks at the beginning, petitioners never had any money in the * * * [Partnership transactions]." In view of the disproportionately large tax benefits claimed on petitioners' Federal income tax returns, relative to the dollar amounts invested, further investigation of the Partnership transactions clearly was required. A careful consideration of the materials

---

[10]    As noted, the total amount of investment tax and business energy credits flowing from Clearwater to Friedman in 1981-- $21,584--was subject to limitation.

in the offering memoranda in these cases, especially the discussions of high writeoffs and risk of audit, should have alerted a prudent and reasonable investor to the questionable nature of the promised deductions and credits.  See Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217; Sacks v. Commissioner, T.C. Memo. 1994-217, affd. 82 F.3d 918 (9th Cir. 1996).

Petitioners' reliance upon the Court of Appeals for the Ninth Circuit's partial reversal of our decision in Osterhout v. Commissioner, T.C. Memo. 1993-251, affd. in part and revd. in part without published opinion sub nom. Balboa Energy Fund 1981 v. Commissioner, 85 F.3d 634 (9th Cir. 1996), is misplaced.  In Osterhout, we found that certain oil and gas partnerships were not engaged in a trade or business and sustained the Commissioner's imposition of the negligence additions to tax with respect to one of the partners therein.[11]  The Court of Appeals for the Ninth Circuit reversed our imposition of the negligence

---

[11]    Osterhout v. Commissioner, T.C. Memo. 1993-251, affd. in part and revd. in part without published opinion sub nom. Balboa Energy Fund 1981 v. Commissioner, 85 F.3d 634 (9th Cir. 1996), involved a group of consolidated cases.  The parties therein agreed to be bound by the Court's opinion regarding the application of the additions to tax under sec. 6653(a), inter alia.  Accordingly, although the Court's analysis focused on one taxpayer, the additions to tax were sustained with respect to all of the taxpayers.

additions to tax.  Petitioners point out that the taxpayer in that case relied in part upon a tax opinion contained in the offering materials.

In the consolidated cases before us, however, petitioners' purported reliance on the tax opinion letter is undermined by their indifference to the numerous caveats and warnings highlighted throughout the offering materials.  Moreover, the offering memoranda for the Partnerships herein warned prospective investors that the accompanying tax opinion letters were not in final form and were prepared for the general partner, and that prospective investors should consult their own professional advisers with respect to the tax benefits and tax risks associated with the Partnerships.  The tax opinion letters accompanying the Clearwater and Poly Reclamation offering memoranda were addressed solely to the general partner and began with the following opening disclaimer:

> This opinion is provided to <u>you for your individual guidance</u>.  <u>We expect that prospective investors will rely upon their own professional advisors</u> with respect to all tax issues arising in connection with their investment in the Partnership and the operations thereof.  We recognize that you intend to include this letter with your offering materials and we have consented to that with the understanding that <u>the purpose in distributing it is</u> to assist your offerees' tax advisors in making their own analysis and <u>not to permit any prospective investor to rely upon our advice in this matter</u>.  [Emphasis added.]

Accordingly, the tax opinion letters expressly indicate that prospective investors such as petitioners were not to rely upon the tax opinion letter. See Collins v. Commissioner, supra. The limited, technical opinion of tax counsel expressed in these letters was not designed as advice upon which taxpayers might rely, and the opinion of counsel itself so states. As sophisticated attorneys and investors, Friedman and Alter knew or should have known that the opinion letter had a limited function, that the caveats and warnings in the letter were to be taken seriously, and certainly that they could not rely upon the opinion letter without full investigation of the economic and other factual assumptions upon which it explicitly was based.

### 2. The So-Called Oil Crisis

Petitioners each testified that they reasonably expected to make an economic profit from the Partnership transactions because plastic is an oil derivative and the United States was experiencing a so-called oil crisis during the year 1981. Based upon our review of the records, we find petitioners' claims unconvincing, regardless of the so-called oil crisis. Moreover, testimony by one of respondent's experts establishes that the oil pricing changes during the late 1970's and early 1980's did not justify petitioners' claiming excessive investment credits and

purported losses based on vastly exaggerated valuations of recycling machinery.

Petitioners did not seriously educate themselves in, or personally investigate, the plastics recycling transactions, nor did they consult any plastics materials or plastics recycling experts regarding the business prospects for such a venture. Alter stipulated that prior to investing in Clearwater: He knew nothing about the business of PI; he did not inquire as to whether there were any other competing machines; he was unaware of any suitable end-users; and he knew nothing about resin prices. Friedman stipulated that prior to investing in Poly Reclamation: He did not investigate whether there were any other competing machines; he did not investigate how the Sentinel EPE recycler functioned; he did not investigate the uniqueness of the machine or whether its purported value was bona fide; and he did not investigate whether there were any suitable end-users for the recyclers. Petitioners did not attempt to resolve the numerous business-related caveats and warnings in the offering memoranda. We are not convinced that petitioners gave sufficient consideration to the business aspects of the Partnerships to show that they intended and reasonably expected to make an economic profit from the transactions, regardless of the so-called oil crisis.

Moreover, petitioners did not adequately explain how the so-called oil crisis provided a reasonable basis for them to invest in the Partnerships and claim the associated tax deductions and credits. The offering materials warned that there could be no assurances that prices for new resin pellets would remain at their then current level. One of respondent's experts, Steven Grossman, explained that the price of plastics materials is not directly proportional to the price of oil. In his report, he stated that less than 10 percent of crude oil is utilized for making plastics materials and that studies have shown that "a 300% increase in crude oil prices results in only a 30 to 40% increase in the cost of plastics products." Furthermore, during 1980 and 1981, in addition to the media coverage of the so-called oil crisis, there was "extensive continuing press coverage of questionable tax shelter plans." Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982).

Petitioners' reliance on Krause v. Commissioner, 99 T.C. 132 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994), is misplaced. The facts in Krause v. Commissioner, supra, are distinctly different from the facts of these cases. In Krause v. Commissioner, supra, the taxpayers invested in limited partnerships whose investment objectives concerned enhanced oil recovery (EOR) technology. The Krause

opinion states that during the late 1970's and early 1980's, the Federal Government adopted specific programs to aid research and development of EOR technology. Id. at 135-136. In holding that the taxpayers in Krause v. Commissioner, supra, were not liable for the negligence additions to tax, this Court noted that one of the Government's expert witnesses acknowledged that "investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970's and early 1980's to invest in EOR technology." Id. at 177. In the present cases, however, as explained by respondent's expert Steven Grossman, the price of plastics materials was not directly proportional to the price of oil, and there is no persuasive evidence that the so-called oil crisis had a substantial bearing on petitioners' decisions to invest. While EOR was, according to our Krause opinion, in the forefront of national policy and the media during the late 1970's and 1980's, there is no showing in these records that the so-called energy crisis would provide a reasonable basis for petitioners' investing in recycling of polyethylene, particularly in the machinery here in question.

In addition, the taxpayers in the Krause case were experienced in or investigated the oil industry and EOR technology specifically. One of the taxpayers in Krause v. Commissioner, supra, undertook significant investigation of the

proposed investment including researching EOR technology.  The other taxpayer was a geological and mining engineer whose work included research of oil recovery methods and who hired an independent geologic engineer to review the offering materials. Id. at 166.  In the present cases, petitioners were not experienced or educated in plastics recycling, and they did not independently investigate the Sentinel recyclers or hire an expert in plastics to evaluate the Partnership transactions.  We consider petitioners' arguments with respect to the Krause case inapplicable.

### 3.  Petitioners' Purported Reliance on Advisers

Petitioners claim that they reasonably relied upon the advice of qualified advisers, specifically several partners at Shea & Gould.  Alter claims that he relied on Feinstein as well. None of the Shea & Gould partners purportedly relied upon by petitioners testified in the trials of these cases.  Feinstein testified in the Alter case.

The concept of negligence and the argument of reliance on an expert are highly fact intensive.  Petitioners in these cases are very well-educated and sophisticated attorneys who at the time of these investments were members of a leading New York City law firm.  Friedman specialized in corporate and Federal securities law.  Alter specialized in entertainment and labor law and also

consulted on various tax and financial issues for his clients. These sophisticated attorneys ultimately relied upon other attorneys to investigate the tax law and the underlying business circumstances of a proposed investment, the success of which depended upon a purportedly technologically unique machine. Neither the attorneys allegedly relied upon by petitioners nor an accountant who reviewed the Clearwater offering memorandum was expert in plastics materials or plastics recycling.

A taxpayer may avoid liability for the additions to tax under section 6653(a)(1) and (2) if he or she reasonably relied on competent professional advice. United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. Freytag v. Commissioner, supra. For reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the taxpayer must show that the professional had the expertise and knowledge of the pertinent facts to provide informed advice on the subject matter. David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621; Goldman v. Commissioner, 39 F.3d 402 (2d Cir. 1994), affg. T.C. Memo. 1993-480; Freytag v. Commissioner, supra; Sacks v.

Commissioner, T.C. Memo. 1994-217; Kozlowski v. Commissioner, T.C. Memo. 1993-430, affd. without published opinion 70 F.3d 1279 (9th Cir. 1995); see also Gollin v. Commissioner, T.C. Memo. 1996-454; Stone v. Commissioner, T.C. Memo. 1996-230; Reimann v. Commissioner, T.C. Memo. 1996-84.

Reliance on representations by insiders, promoters, or offering materials has been held an inadequate defense to negligence. Goldman v. Commissioner, supra; Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo. 1991-181; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991); Marine v. Commissioner, 92 T.C. 958, 992-993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); McCrary v. Commissioner, 92 T.C. 827, 850 (1989); Rybak v. Commissioner, 91 T.C. 524, 565 (1988). Pleas of reliance have been rejected when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture. David v. Commissioner, supra; Goldman v. Commissioner, supra; Freytag v. Commissioner, supra; Beck v. Commissioner, 85 T.C. 557 (1985); Lax v. Commissioner, T.C. Memo. 1994-329, affd. without published

opinion 72 F.3d 123 (3d Cir. 1995); Sacks v. Commissioner, supra; Steerman v. Commissioner, T.C. Memo. 1993-447; Rogers v. Commissioner, T.C. Memo. 1990-619; see also the Plastics Recycling cases cited supra note 8.

In addition to his professional experience as a corporate and Federal securities lawyer, by 1981 Friedman had made a "great number" of personal investments.  His approach to these investments was rigorous and methodical:  he read the prospectus or private offering memorandum, spoke to an expert in the pertinent industry, investigated the risk factors described in the offering materials, consulted industry reports, and spoke to other active investors or lawyers.  With respect to Clearwater, however, Friedman's investigation was wanting.  Friedman did not speak to a plastics materials or plastics recycling expert, or investigate the risk factors described in the offering memorandum, or consult plastics industry trade journals or reports.  His investigation of Clearwater entailed nothing more than reading the offering memorandum and discussing the investment with other attorneys at Shea & Gould.  Friedman testified that he also provided a copy of the offering memorandum to his accountant and that his accountant did not advise against the investment.  The accountant, however, had no experience in plastics or plastics recycling, and did not independently

investigate the plastics industry or the Sentinel EPE recycler. Moreover, the accountant did not testify at the trial of Friedman's case, and the substance of his advice, if any, is not clear from Friedman's testimony. See Howard v. Commissioner, 931 F.2d 578, 582 (9th Cir. 1991), affg. T.C. Memo. 1988-531; Patin v. Commissioner, 88 T.C. 1086, 1131 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989), rejecting claims to reliance on an accountant under analogous circumstances.

Friedman recalled that approximately eight other partners at Shea & Gould either invested in, or to some extent reviewed, the Plastics Recycling transactions. Of these, three were litigators (Carroll, Ferraro, and Leon Gold), one specialized in bankruptcy law (Hirshfield), two specialized in corporate and/or Federal securities law (Arnold Jacobs and Thomas Constance), and one specialized in taxation (Parker). Friedman did not indicate the area of practice of the other partner he mentioned, Trost. Asked if any of these partners were experts in the plastics industry, Friedman replied: "I don't believe any of them were, although I believe that * * * Dan Carroll had an engineering background and

I think Joe Ferraro may have had some experience in his past with plastics, * * * But I am not sure of that at this point."

Friedman had a vague recollection of the investigation conducted by the other partners at Shea & Gould. He recalled that Hirshfield and Trost visited PI, and that Carroll made inquiries of people in the plastics business. Friedman did not indicate what, if anything, Ferraro did. He tentatively recalled receiving reports, perhaps written, that the partners investigating the Plastics Recycling transactions "had gotten information that there was a substantial market" for the recycled pellets. He also testified that certain "members of * * * [Shea & Gould spoke] to plastics experts who told * * * [them] that there was a substantial market for the product of these machines." Friedman could not recall, however, which partners spoke to these purported experts, or whether the experts consulted were independent of PI. He testified that the partners who visited PI (Hirshfield and Trost) "reported to us that they weren't aware of any other machines that did precisely what this machine did". In fact, the Sentinel EPE recycler was not unique. Instead, several machines capable of densifying low density materials were already on the market. Other plastics recycling machines available during 1981 ranged in price from $20,000 to $200,000, including the Foremost Densilator, Nelmor/Weiss

Densification System (Regenolux), Buss-Condux Plastcompactor, and Cumberland Granulator.[12]  See <u>Provizer v. Commissioner</u>, T.C. Memo. 1992-177.  Friedman did not explain what Hirshfield and Trost did, if anything, to become aware of competing plastics recyclers, aside from their visit to PI.

Friedman acknowledged that he is "sophisticated enough to know that in any tax investment the underlying economics have to be legitimate", and he stipulated to the effect that he understood that the purported value of the Sentinel EPE recycler generated the tax benefits he claimed on his return.  He also understood from Parker, the partner "primarily responsible" for reviewing the tax aspects of the Plastics Recycling transactions, that the tax benefits were supportable provided "that from a business point of view this was a good economic investment". Nonetheless, Friedman stipulated that he never saw a Sentinel EPE recycler, or investigated the uniqueness of the machine, or investigated whether the value placed on the recycler was bona fide, or investigated whether there were any other machines that were designed to recycle low density polyethylene.  Friedman's testimony about his modest investigation prior to investing in

---

[12]   Petitioners Alter and Friedman each stipulated to the availability of the Foremost Densilator, Nelmor/Weiss Densification System (Regenolux), Buss-Condux Plastcompactor, and Cumberland Granulator during 1981.

the plastics recycling transaction was generally vague, qualified, and unconvincing.

Friedman sought to establish that he monitored his investment in Clearwater. He testified that he spoke to Hirshfield and Trost on a number of occasions "about the progress of the partnership". Friedman stated: "I believe that within the first year or so, I received favorable reports that it was doing well and the machines were doing well." In Provizer v. Commissioner, supra, this Court found:

> At no time were all six of the Sentinel EPE Recyclers * * * leased by Clearwater placed with end-users. * * * the recyclers were used infrequently and they often were not in use at all. PI failed promptly to pick up either the scrap or machines rejected by prospective end-users, and at times did not pay the end-user for the scrap that PI did pick up.

Friedman submitted into the record several updates regarding the placement of the recyclers and the performance of Clearwater. A May 19, 1982, update indicated that end-users had been found for four recyclers. Financial statements for the years ended 1981 and 1982 showed that Clearwater was operating at a loss. In a preface to the financial statements, the accounting firm that prepared them, H. W. Freedman & Co., stated as follows:

> The financial statements have been prepared on a basis of accounting other than generally accepted accounting principles * * *. The compilation is limited to presenting in the form of financial statements information that is the representation of the

Partnership.  We have not audited or reviewed the accompanying financial statements and, accordingly, do not express an opinion on them.

We are not independent with respect to Clearwater Group.

H. W. Freedman & Co. prepared the partnership returns for ECI Corp. and F & G Corp.  The named partner of H. W. Freedman & Co., Harris W. Freedman, was the president and chairman of the board of F & G Corp., and owned 94 percent of a Sentinel EPE recycler. A June 13, 1983, update submitted into the record by Friedman contained an April 9, 1983, sales summary showing a first quarter gross profit of $14.43.

Like Friedman's perfunctory investigation of Clearwater, Alter's investigation of Poly Reclamation was limited to reading the offering memorandum and discussing the investment with others at Shea & Gould.  The colleagues he spoke to included Hirshfield, Carroll, Parker, and Ferraro, in addition to Feinstein, in whom Alter claims he reposed "particular confidence" based upon their long professional association.  Alter recalled the investigation by his colleagues at Shea & Gould in general terms, and portions of his testimony were inconsistent with Feinstein's recollection of events.  For example, Alter testified that he asked Feinstein to speak with Parker, but Feinstein testified that Parker "didn't speak to me."  Alter was under the impression that "Feinstein's

friend" (Lauren) had read the offering memorandum, but Feinstein was explicit that Lauren had not seen an offering memorandum.

Feinstein's investigation of Poly Reclamation and the Plastics Recycling transactions was very limited. He spoke with Lauren, who may have had some insight into plastics materials, but Feinstein only asked Lauren about PI's reputation. Feinstein did not provide Lauren with a copy of the offering memorandum, or ask him about the prospects for a Sentinel EPE recycler, or inquire as to whether there were any competing machines already on the market. He accepted the purported value of the Sentinel EPE recycler after speaking with a friend and associate "about pricing and how things are priced in * * * [the plastics] industry." The friend and associate--unidentified by Feinstein-- only allegedly confirmed that the stream-of-income method of valuation was used in the industry. Feinstein did not verify any of the underlying assumptions upon which the income projections in the offering memorandum were based. Neither Feinstein nor Lauren visited PI to see a Sentinel EPE recycler, or investigated whether competitive machines existed. Feinstein testified that he had telephone conversations with Winer, but he did not explain whether they discussed Poly Reclamation or the Plastics Recycling transactions, or the nature of Winer's advice, if any. See Howard v. Commissioner, 931 F.2d at 582; Patin v. Commissioner,

88 T.C. at 1131, rejecting claims to reliance on an adviser where there is no showing that relevant advice was given.

Alter also recalled speaking to Winer. He thought he remembered that Winer had indicated that end-users had been scheduled for the machines, but that Winer did not name the end-users. Alter did not mention having any other conversations with Winer. Also like Feinstein, Alter accepted at face value all of the representations made in the offering memorandum. At trial, he was asked what made the Sentinel EPE recycler unique. He replied:

> I believe the representation was that they had a special fluid cooling process that was not available elsewhere. They made the representations that it had a dual set of blades, I believe, rotary blades, exterior rotary blade[s] as well as the interior blades, that would crush the plastic material more effectively.

In Provizer v. Commissioner, T.C. Memo. 1992-177, we found that PI's vice president of manufacturing and a developer of PI's prototype recycler, William Strlzelewicz,

> explained that the coolant used in the process was plain water and not some "trade secret" chemical compound. End-users stated that a usual method by which the water might be "injected" was for a factory worker to dump it on the heated material. * * *

Among the recycler's component parts were replaceable rotating and stationary cutting blades.

Like Friedman, Alter submitted several documents into the record as evidence that he monitored his investment in Poly Reclamation. Of a total of six documents submitted, only one dealt with Poly Reclamation. That one, dated September 30, 1982, indicated that three of Poly Reclamation's Sentinel EPE recyclers had been placed and were running. The other five documents dealt with partnerships that owned Sentinel EPS recyclers. An August 29, 1985, letter discussed "the impossible pricing situation that continues in the polystyrene market." The remaining documents were two financial statements for Stevens Recycling Associates (Stevens Recycling) for the years ended 1982, 1983, and 1984, and two reports regarding the placement of the Sentinel EPS recyclers owned by Stevens Recycling.

Alter was not sufficiently confident of Poly Reclamation and the Plastics Recycling transactions to recommend them expressly to his clients. On direct examination, he was asked if, "in connection with the making of this investment yourself, and in recommending" the investment to his clients, he earned a commission. Alter replied: "No, I did not, and I would like to correct your use of the word 'recommend.' I told them I was going into it and it seemed sound, and if they were interested they could participate as well." Alter reiterated this point on cross-examination in the following exchange:

Q  Did you suggest that your clients consult with others who were plastics experts?

A  No.  I told them that I was investing and that it seemed like a sound investment to me, and if they were interested they could participate as well.

Q  Did you recommend the investment?

A  To the extent that I just stated.

Feinstein was asked what his recollection was regarding the nature "of the recommendation and how it was presented by Mr. Alter".  He replied:  "It is my recollection and based on how I was and he was with clients, that it was a possible investment. He thought it would work for them and would work as an investment with no--no pressure at all.  * * *  Most certainly not pressure."

Just as Alter mentioned but did not "recommend" the Plastics Recycling transactions to his clients, there is no showing in docket No. 6302-89 that any of the Shea & Gould partners recommended or advised that Alter invest in Poly Reclamation. Feinstein claimed that he came to a positive conclusion with respect to the soundness of the Plastics Recycling transactions and that he communicated this conclusion to Alter.  Yet, as Alter well knew, Feinstein did not personally invest in a Plastics Recycling transaction, nor did his friend Lauren.

We hold that petitioners' purported reliance on the other partners at Shea & Gould, and in Alter's case Feinstein as well, was not reasonable, not in good faith, nor based upon full disclosure. Petitioners' testimony in these cases was self-serving, and at times vague and elusive and this Court is not required to accept it as true. Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964); Niedringhaus v. Commissioner, 99 T.C. 202, 212 (1992); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Snyder v. Commissioner, T.C. Memo. 1995-285; Sacks v. Commissioner, T.C. Memo. 1994-217. Moreover, petitioners' failure to call any of the Shea & Gould partners to testify gives rise to the inference that their testimony would not have been favorable to petitioners. Mecom v. Commissioner, 101 T.C. 374, 386 (1993), affd. without published opinion 40 F.3d 385 (5th Cir. 1994); Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947); Sacks v. Commissioner, supra.

The purported value of the Sentinel EPE recycler generated the deductions and credits in these cases, and that circumstance was reflected in the offering memoranda. Certainly Parker and Feinstein recognized the nature of the tax benefits and, given

their education and professional experiences, petitioners should have recognized it as well. Friedman acknowledged that he recognized the nature of the tax benefits, and undoubtedly they were made clear to Alter by Feinstein. Yet, neither Friedman, Alter, nor their colleagues at Shea & Gould confirmed the value of the Sentinel EPE recycler. The records in these cases show that in the end, petitioners and their colleagues relied on PI personnel for the value of the Sentinel EPE recyclers and the economic viability of the Partnership transactions. See Vojticek v. Commissioner, T.C. Memo. 1995-444, to the effect that advice from such persons "is better classified as sales promotion."

Neither Feinstein nor the participating partners at Shea & Gould had any expertise in plastics materials or plastics recycling. Although Ferraro apparently worked many years ago for one or more summers at a plastics company, and Carroll had an engineering background, they did not testify in these cases, and the records fail to establish that Ferraro's summer job experience, or Carroll's engineering background, adequately enabled them to assess the Plastics Recycling transactions. A taxpayer may rely upon his advisers' expertise, but it is not reasonable or prudent to rely upon an adviser regarding matters outside of his field of expertise or with respect to facts that he does not verify. See David v. Commissioner, 43 F.3d at 789-

790; Goldman v. Commissioner, 39 F.3d at 408; Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affg. Patin v. Commissioner, 88 T.C. 1086 (1987); Lax v. Commissioner, T.C. Memo. 1994-329; Sacks v. Commissioner, supra; Rogers v. Commissioner, T.C. Memo. 1990-619.

### 4. Miscellaneous

The parties in these consolidated cases stipulated that the fair market value of a Sentinel EPE recycler in 1981 was not in excess of $50,000. Regardless of this concession, petitioners contend that they were reasonable in claiming credits on their Federal income tax returns based upon each recycler's having a value of $1,162,666. In support of this position, petitioners rely upon preliminary reports prepared for respondent by Ernest D. Carmagnola (Carmagnola), the president of Professional Plastic Associates. Carmagnola had been retained by the IRS in 1984 to evaluate the Sentinel EPE and EPS recyclers in light of what he described as "the fantastic values placed on the * * * [recyclers] by the owners." Based on limited information available to him at that time, Carmagnola preliminarily estimated that the value of the Sentinel EPE recycler was $250,000. However, after additional information became available to him, Carmagnola concluded in a signed affidavit, dated March 16, 1993,

that the machines actually had a fair market value of not more than $50,000 each in the fall of 1981.[13]

We accord no weight to the Carmagnola reports submitted by petitioners. The projected valuations therein were based on inadequate information, research, and investigation, and were subsequently rejected and discredited by their author. In one preliminary report, Carmagnola states that he has "a serious concern of actual profit" of a Sentinel EPE recycler and that to determine whether the machines actually could be profitable, he required additional information from PI. Carmagnola also indicates that in preparing the report, he did not have information available concerning research and development costs of the machines and that he estimated those costs in his valuations of the machines.

Respondent rejected the Carmagnola reports and considered them unsatisfactory for any purpose, and there is no indication in the records that respondent used them as a basis for any determinations in the notices of deficiency. Even so, counsel

---

[13] The parties stipulated as to the authenticity of the Carmagnola reports, but respondent objected on grounds of relevance, materiality and hearsay. Since these reports have been included in the record in many other plastics recycling cases, we admitted them into evidence with the caveat that if Mr. Carmagnola was not called to testify, we expected to give minimal weight to the reports.

for petitioners obtained copies of these reports and urge that they support the reasonableness of the values reported on petitioners' returns.  Not surprisingly, counsel in these cases did not call Carmagnola to testify, but preferred instead to rely solely upon his preliminary ill-founded valuation estimates. Carmagnola has not been called to testify in any of the Plastics Recycling cases before us.  The Carmagnola reports were a part of the record considered by this Court and reviewed by the Court of Appeals for the Sixth Circuit in the Provizer case, where we held the taxpayers negligent.  Consistent therewith, we find in these cases, as we have found previously, that the reports prepared by Carmagnola are unreliable and of no consequence.  Petitioners are not relieved of the negligence additions to tax based on the preliminary reports prepared by Carmagnola.

Petitioners cite a number of cases in support of their positions, but primarily rely on Durrett v. Commissioner, 71 F.3d 515 (5th Cir. 1996), affg. in part and revg. in part T.C. Memo. 1994-179; Chamberlain v. Commissioner, 6 F.3d 729 (5th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1994-228; Mollen v. United States, 72 AFTR 2d 93-6443, 93-2 USTC par. 50,585 (D. Ariz. 1993); Reile v. Commissioner, T.C. Memo. 1992-488; and Davis v. Commissioner, T.C. Memo. 1989-607.

This Court declined to sustain the negligence additions to tax in the Reile and Davis cases for reasons inapposite to the facts herein.  In the Davis case, the taxpayers reasonably relied upon a "trusted and long-term adviser" who was independent of the investment venture, and the offering materials reviewed by the taxpayers did not reflect that the principals in the venture lacked experience in the pertinent line of business.  In the Reile case, the taxpayers, a married couple, had only 1 year of college between them and characterized themselves as financial "dummies."  In contrast to those cases, petitioners herein are well-educated and experienced professionals.  Friedman is a corporate and Federal securities lawyer intimately familiar with public and private placements, while Alter is an entertainment and labor lawyer who also assists a number of his clients in financial matters.  Feinstein and the participating partners at Shea & Gould were colleagues contemplating a similar investment, not long-term advisers to petitioners.  In addition, the offering memoranda warned that the Partnerships had no prior operating history and that the general partner had no prior experience in marketing recycling or similar equipment.  Accordingly, petitioners' reliance on the Reile and Davis cases is misplaced.

In Mollen v. United States, supra, the taxpayer was a medical doctor who specialized in diabetes and who, on behalf of

the Arizona Medical Association, led a continuing medical education (CME) accreditation program for local hospitals.  The underlying tax matter involved the taxpayer's investment in Diabetics CME Group, Ltd., a limited partnership that invested in the production, marketing, and distribution of medical educational video tapes.  The District Court found that the taxpayer's personal expertise and insight in the underlying investment gave him reason to believe it would be economically profitable.  Although the taxpayer was not experienced in business or tax matters, he did consult with an accountant and a tax lawyer regarding those matters.  Moreover, the District Court noted that the propriety of the taxpayer's disallowed deduction therein was "reasonably debatable."  Id. at 93-6447, 93-2 USTC par. 50,585, at 89,895; see Zfass v. Commissioner, T.C. Memo. 1996-167.

In contrast, there is no showing in these cases that petitioners or their colleagues had any personal insight or industry know-how in plastics recycling that would reasonably lead them to believe that the Plastics Recycling transactions would be economically profitable.[14]  Feinstein spoke to Lauren,

---

[14]    Ferraro apparently worked for one or more summers at a plastics company, and Carroll had an engineering background, but neither Ferraro nor Carroll testified in these cases, and the
(continued...)

but their discussion was limited to Lauren's impression of PI. Lauren did not read the Poly Reclamation offering memorandum, see a Sentinel EPE recycler, or do any type of investigation into the plastics recycling market. Petitioners and their colleagues did not hire any independent experts in the field of plastic materials or plastics recycling. They relied upon representations by insiders to the Plastics Recycling transactions. Accordingly, we consider petitioners' arguments with respect to the Mollen case inapplicable under the circumstances of these cases.

Petitioners' reliance on the Durrett and Chamberlain cases is also misplaced. In those cases, the Court of Appeals for the Fifth Circuit reversed this Court's imposition of the negligence additions to tax in two nonplastics recycling cases. The taxpayers in the Durrett and Chamberlain cases were among thousands who invested in the First Western tax shelter program involving alleged straddle transactions of forward contracts. In the Durrett and Chamberlain cases, the Court of Appeals for the Fifth Circuit concluded that the taxpayers reasonably relied upon professional advice concerning tax matters. In other First

---

[14](...continued)
records fail to establish that they were qualified to analyze the Sentinel EPE recycler or the Plastics Recycling transactions.

Western cases, however, the Courts of Appeals have affirmed decisions of the Tax Court imposing negligence additions to tax. See Foulds v. Commissioner, T.C. Memo. 1994-489 (the well-educated taxpayer failed to establish the substance of advice, and the purported adviser lacked tax expertise), affd. without published opinion 94 F.3d 651 (9th Cir. 1996); Chakales v. Commissioner, T.C. Memo. 1994-408 (reliance on a long-term adviser, who was a tax attorney and accountant, and who in turn relied on a promoter of the venture, held unreasonable), affd. 79 F.3d 726 (8th Cir. 1996); Kozlowski v. Commissioner, T.C. Memo. 1993-430 (reliance on adviser held unreasonable absent a showing that the adviser understood the transaction and was qualified to give an opinion whether it was bona fide), affd. without published opinion 70 F.3d 1279 (9th Cir. 1995); Freytag v. Commissioner, 89 T.C. at 849 (reliance on tax advice given by attorneys and C.P.A.'s held unreasonable absent a showing that the taxpayers consulted any experts regarding the bona fides of the transactions).  Here we have found that none of petitioners' colleagues at Shea & Gould, including Ferraro, Carroll, and Feinstein, possessed sufficient knowledge of the plastics or recycling industries to render a competent opinion.  This fact has been deemed relevant by the Court of Appeals for the Second Circuit, the court to which appeal in these cases lies.  See

David v. Commissioner, 43 F.3d at 789-790 (taxpayers' reliance on expert advice not reasonable where expert lacks knowledge of business in which taxpayers invested); Goldman v. Commissioner, 39 F.3d at 408 (same).  Accordingly, petitioners shall not be relieved of the negligence additions to tax based upon the decisions in the Durrett and Chamberlain cases by the Court of Appeals for the Fifth Circuit.[15]

5.  Conclusion as to Negligence

Under the circumstances of these consolidated cases, petitioners failed to exercise due care in claiming large deductions and tax credits with respect to the Partnerships on their Federal income tax returns.  We hold that petitioners did not reasonably rely upon the offering memoranda and their colleagues at Shea & Gould.  Friedman knew that the tax benefits were contingent upon the purported value of the Sentinel EPE recycler, and certainly Alter understood this circumstance or learned as much from Feinstein.  Yet, neither petitioners nor their purported advisers in good faith investigated the fair

---

[15]    Other cases cited by petitioners are inapplicable and distinguishable for the following general, nonexclusive reasons: (1) They involve far less sophisticated, if not unsophisticated, taxpayers; (2) the reasonableness of the respective taxpayers' reliance on expert advice was established in those cases on grounds that do not exist here; and (3) the advice given was within the adviser's area of expertise.

market value of a Sentinel EPE recycler, or the underlying viability, financial structure, and economics of the Partnership transactions.  These sophisticated, able, and successful taxpayers knew or should have known better.  We hold, upon consideration of the entire records, that petitioners are liable for the negligence additions to tax under section 6653(a)(1) and (2) for the taxable year at issue.  Respondent is sustained on this issue.

B.  Section 6659--Valuation Overstatement

In notices of deficiency, respondent determined that petitioners were liable for the section 6659 addition to tax on the portion of their respective underpayments attributable to valuation overstatement.  Petitioners have the burden of proving that respondent's determinations of the section 6659 additions to tax in their cases are erroneous.  Rule 142(a); Luman v. Commissioner, 79 T.C. at 860-861.

A graduated addition to tax is imposed when an individual has an underpayment of tax that equals or exceeds $1,000 and "is attributable to" a valuation overstatement.  Sec. 6659(a), (d). A valuation overstatement exists if the fair market value (or adjusted basis) of property claimed on a return equals or exceeds 150 percent of the amount determined to be the correct amount. Sec. 6659(c).  If the claimed valuation exceeds 250 percent of

the correct value, the addition is equal to 30 percent of the underpayment.  Sec. 6659(b).

Petitioners claimed tax benefits, including an investment tax credit and a business energy credit, based on purported values of $1,162,666 for each Sentinel EPE recycler.  Petitioners concede that the fair market value of a Sentinel EPE recycler in 1981 was not in excess of $50,000.  Therefore, if disallowance of petitioners' claimed tax benefits is attributable to such valuation overstatements, petitioners are liable for the section 6659 additions to tax at the rate of 30 percent of the underpayments of tax attributable to the tax benefits claimed with respect to the Partnerships.

Petitioners contend that section 6659 does not apply in their cases for the following three reasons:  (1) Disallowance of the claimed tax benefits was attributable to other than a valuation overstatement; (2) petitioners' concessions of the claimed tax benefits preclude imposition of the section 6659 additions to tax; and (3) respondent erroneously failed to waive the section 6659 additions to tax.  We reject each of these arguments for reasons set forth below.

1.  The Grounds for Petitioners' Underpayments

Section 6659 does not apply to underpayments of tax that are not "attributable to" valuation overstatements.  See McCrary v.

Commissioner, 92 T.C. at 827; Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988).  To the extent taxpayers claim tax benefits that are disallowed on grounds separate and independent from alleged valuation overstatements, the resulting underpayments of tax are not regarded as attributable to valuation overstatements.  Krause v. Commissioner, 99 T.C. at 178 (citing Todd v. Commissioner, supra).  However, when valuation is an integral factor in disallowing deductions and credits, section 6659 is applicable. See Illes v. Commissioner, 982 F.2d 163, 167 (6th Cir. 1992), affg. T.C. Memo. 1991-449; Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991) (the section 6659 addition to tax applies if a finding of lack of economic substance is "due in part" to a valuation overstatement), affg. T.C. Memo. 1989-684; Masters v. Commissioner, T.C. Memo. 1994-197, affd. without published opinion 70 F.3d 1262 (4th Cir. 1995); Harness v. Commissioner, T.C. Memo. 1991-321.

Petitioners argue that the disallowance of the claimed tax benefits was not "attributable to" a valuation overstatement. According to petitioners, the tax benefits were disallowed because the Partnership transactions lacked economic substance, not because of any valuation overstatements.  It follows, petitioners reason, that because the "attributable to" language

of section 6659 requires a direct causative relationship between a valuation overstatement and an underpayment in tax, section 6659 cannot apply to their deficiencies. Petitioners cite the following cases to support this argument: Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), affg. T.C. Memo. 1988-416, McCrary v. Commissioner, supra, and Todd v. Commissioner, supra.

Petitioners' argument rests on the mistaken premise that our holding herein that the Partnership transactions lacked economic substance was separate and independent from the overvaluation of the Sentinel EPE recyclers. To the contrary, in holding that the Partnership transactions lacked economic substance, we relied heavily upon the overvaluation of the recyclers. Overvaluation of the recyclers was an integral factor in regard to: (1) The disallowed tax credits and other benefits in these cases; (2) the underpayments of tax; and (3) our finding that the Partnership transactions lacked economic substance.

Petitioners argue that in Provizer v. Commissioner, T.C. Memo. 1992-177, we found that the Clearwater transaction lacked economic substance for reasons independent of the valuation reported in that case. According to petitioners, the purported value of the recyclers in the Clearwater transaction was

predicated upon a projected stream of royalty income, and this Court merely rejected the taxpayers' valuation method. Petitioners misread and distort our Provizer opinion. In the Provizer case, overvaluation of the Sentinel EPE recyclers, irrespective of the technique employed by the taxpayers in their efforts to justify the overvaluation, was the dominant factor that led us to hold that the Clearwater transaction lacked economic substance. Likewise, overvaluation of the Sentinel EPE recyclers in these cases is the ground for our holding herein that the Partnership transactions lacked economic substance.

Moreover, a virtually identical argument was recently rejected in Gilman v. Commissioner, supra, by the Court of Appeals for the Second Circuit, the court to which appeal in these cases lies. See Golsen v. Commissioner, 54 T.C. 742, 756-758 (1970), affd. 445 F.2d 985 (10th Cir. 1971). In the Gilman case, the taxpayers engaged in a computer equipment sale and leaseback transaction that this Court held was a sham transaction lacking economic substance. The taxpayers therein, citing Todd v. Commissioner, supra, and Heasley v. Commissioner, supra, argued that their underpayment of taxes derived from nonrecognition of the transaction for lack of economic substance, independent of any overvaluation. The Court of Appeals for the Second Circuit sustained imposition of the section 6659 addition

to tax because overvaluation of the computer equipment contributed directly to this Court's earlier conclusion that the transaction lacked economic substance and was a sham. Gilman v. Commissioner, supra at 151. In addition, the Court of Appeals for the Second Circuit agreed with this Court and with the Court of Appeals for the Eighth Circuit that "'when an underpayment stems from disallowed * * * investment credits due to lack of economic substance, the deficiency is * * * subject to the penalty under section 6659.'" Gilman v. Commissioner, supra at 151 (quoting Massengill v. Commissioner, 876 F.2d 616, 619-620 (8th Cir. 1989), affg. T.C. Memo. 1988-427); see also Rybak v. Commissioner, 91 T.C. at 566-567; Zirker v. Commissioner, 87 T.C. 970, 978-979 (1986); Donahue v. Commissioner, T.C. Memo. 1991-181, affd. without published opinion 959 F.2d 234 (6th Cir. 1992), affd. sub nom. Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993).

Petitioners' reliance on Gainer v. Commissioner, supra, Todd v. Commissioner, supra, and McCrary v. Commissioner, 92 T.C. at 827, is misplaced. In those cases, in contrast to the consolidated cases herein, it was found that a valuation overstatement did not contribute to an underpayment of taxes. In the Todd and Gainer cases, the underpayments were due exclusively to the fact that the property in each case had not been placed in

service.  In the McCrary case, the underpayments were deemed to result from a concession that the agreement at issue was a license and not a lease.  Although property was overvalued in each of those cases, the overvaluations were not the grounds on which the taxpayers' liability was sustained.  In contrast, "a different situation exists where a valuation overstatement * * * is an integral part of or is inseparable from the ground found for disallowance of an item."  McCrary v. Commissioner, supra at 859.  Petitioners' cases present just such a "different situation":  overvaluation of the recyclers was integral to and inseparable from petitioners' claimed tax benefits and our holding that the Partnership transactions lacked economic substance.[16]

    2.  Concession of the Deficiencies

---

[16]    To the extent that Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, merely represents an application of Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988), we consider it distinguishable.  To the extent that the reversal in the Heasley case is based on a concept that where an underpayment derives from the disallowance of a transaction for lack of economic substance, the underpayment cannot be attributable to an overvaluation, this Court and the Court of Appeals for the Second Circuit have disagreed.  See Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991) ("The lack of economic substance was due in part to the overvaluation, and thus the underpayment was attributable to the valuation overstatement"), affg. T.C. Memo. 1989-684.

Petitioners argue that their concessions of the deficiencies preclude imposition of the section 6659 additions to tax. Petitioners contend that their concessions render any inquiry into the grounds for such deficiencies moot. Absent such inquiry, petitioners argue that it cannot be known whether their underpayments were attributable to a valuation overstatement or another discrepancy. Without a finding that a valuation overstatement contributed to an underpayment, according to petitioners, section 6659 cannot apply. In support of this line of reasoning, petitioners rely heavily upon Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990) and McCrary v. Commissioner, supra.

Petitioners' open-ended concessions do not obviate our finding that the Partnership transactions lacked economic substance due to overvaluation of the recyclers. This is not a situation where we have "to decide difficult valuation questions for no reason other than the application of penalties." See McCrary v. Commissioner, supra at 854 n.14. The value of the Sentinel EPE recycler was established in Provizer v. Commissioner, T.C. Memo. 1992-177, and stipulated by the parties. As a consequence of the inflated value assigned to the recyclers by the Partnerships, petitioners claimed deductions and credits that resulted in underpayments of tax, and we held that the

Partnership transactions lacked economic substance. Regardless of petitioners' concessions, in these cases the underpayments of tax were attributable to the valuation overstatements.

Moreover, concession of the investment tax credit in and of itself does not relieve taxpayers of liability for the section 6659 addition to tax. See Dybsand v. Commissioner, T.C. Memo. 1994-56; Chiechi v. Commissioner, T.C. Memo. 1993-630. Instead, the ground upon which the investment tax credit is disallowed or conceded is significant. Dybsand v. Commissioner, supra. Even in situations in which there are arguably two grounds to support a deficiency and one supports a section 6659 addition to tax and the other does not, the taxpayer may still be liable for the addition to tax. Gainer v. Commissioner, 893 F.2d at 228; Irom v. Commissioner, 866 F.2d 545, 547 (2d Cir. 1989), vacating in part T.C. Memo. 1988-211; Harness v. Commissioner, T.C. Memo. 1991-321.

In the present cases, no argument was made and no evidence was presented to the Court to prove that disallowance and concession of the claimed investment tax credits and other tax benefits related to anything other than a valuation overstatement. To the contrary, petitioners each stipulated substantially the same facts concerning the Partnership transactions as we found in Provizer v. Commissioner, supra. In

the _Provizer_ case, we held that the taxpayers were liable for the section 6659 addition to tax because the underpayment of taxes was directly related to the overvaluation of the Sentinel EPE recyclers.  The overvaluation of the recyclers, exceeding 2,325 percent, was an integral part of our findings in _Provizer_ that the transaction was a sham and lacked economic substance. Similarly, the records in these cases plainly show that the overvaluation of the recyclers is integral to and is the core of our holding that the underlying transactions here were shams and lacked economic substance.

Petitioners' reliance on _McCrary v. Commissioner_, _supra_, is misplaced.  In that case, the taxpayers conceded disentitlement to their claimed tax benefits, and the section 6659 addition to tax was held inapplicable.  However, the taxpayers' concession of the claimed tax benefits, in and of itself, did not preclude imposition of the section 6659 addition to tax.  In _McCrary v. Commissioner_, _supra_, the section 6659 addition to tax was disallowed because the agreement at issue was conceded to be a license and not a lease.  In contrast, the records in petitioners' cases plainly show that petitioners' underpayments were attributable to overvaluation of the Sentinel EPE recyclers.

Petitioners' reliance on McCrary v. Commissioner, supra, is rejected.[17]

We held in Provizer v. Commissioner, supra, that each Sentinel EPE recycler had a fair market value not in excess of $50,000. Our finding in the Provizer case that the Sentinel EPE recyclers had been overvalued was integral to and inseparable from our holding of a lack of economic substance. The Clearwater transaction was considered in the Provizer case, and Alter stipulated that the Poly Reclamation transaction is substantially identical to the Clearwater transaction. In addition, petitioners each stipulated that the fair market value of a Sentinel EPE recycler in 1981 was not in excess of $50,000. Given those concessions, and the fact that the records here plainly show that the overvaluations of the recyclers were the only reason for the disallowance of the claimed tax benefits, we conclude that the deficiencies were attributable to overvaluation of the Sentinel EPE recyclers.

### 3.   Section 6659(e)

[17]   Petitioners' citation of Heasley v. Commissioner, supra, in support of the concession argument is also rejected. That case was not decided by the Court of Appeals for the Fifth Circuit on the basis of a concession. Moreover, see supra note 15 to the effect that the Court of Appeals for the Second Circuit and this Court have not followed the Heasley opinion with respect to the application of sec. 6659.

Petitioners argue that respondent erroneously failed to waive the section 6659 additions to tax.  Section 6659(e) authorizes the Commissioner to waive all or part of the addition to tax for valuation overstatement if taxpayers establish that there was a reasonable basis for the adjusted bases or valuations claimed on the returns and that such claims were made in good faith.  The Commissioner's refusal to waive a section 6659 addition to tax is reviewable by this Court for abuse of discretion.  Krause v. Commissioner, 99 T.C. at 179.  Abuse of discretion has been found in situations where the Commissioner's refusal to exercise her discretion is arbitrary, capricious, or unreasonable.  See Mailman v. Commissioner, 91 T.C. 1079 (1988); Estate of Gardner v. Commissioner, 82 T.C. 989 (1984); Haught v. Commissioner, T.C. Memo. 1993-58.

We note initially that petitioners did not request respondent to waive the section 6659 additions to tax until well after the trials of these cases.  Petitioners each made their requests approximately 4 months after the trials of their cases.  We are reluctant to find that respondent abused her discretion in these cases when she was not timely requested to exercise it and there is no direct evidence of any abuse of administrative discretion.  Haught v. Commissioner, supra; cf. Wynn v.

Commissioner, T.C. Memo. 1995-609; Klieger v. Commissioner, T.C. Memo. 1992-734.

However, we do not decide this issue solely on petitioners' failure timely to request waivers, but instead, we have considered the issue on its merits. Petitioners urge that they relied on the respective offering materials and their colleagues at Shea & Gould in deciding on the valuation claimed on their tax returns. Petitioners contend that such reliance was reasonable and, therefore, that respondent should have waived the section 6659 additions to tax. However, as we explained above in finding petitioners liable for the negligence additions to tax, petitioners' purported reliance on the offering materials and their colleagues was not reasonable.

Each petitioner read the offering memoranda for the Partnerships, which contained numerous warnings and caveats, including the likelihood that the value placed on the recyclers would be challenged by the IRS as being in excess of fair market value. Friedman recognized that the purported value of the Sentinel EPE recycler was intrinsic to the tax benefits, and Alter undoubtedly learned as much on his own or from one of his colleagues. Even so, there is no showing in the records in these cases that petitioners or the persons they purportedly relied upon--including Ferraro and Carroll--were qualified to assess or

analyze the technical aspects of the Plastics Recycling transactions. Nor do the records show that petitioners or their colleagues ever hired any plastics engineering or technical experts with respect to the Plastics Recycling transactions. Feinstein spoke with Lauren, who may have had some knowledge of the plastics industry, but their discussion was limited to PI's reputation; Feinstein refrained from asking Lauren anything about plastics recycling, competitive machines, or these particular Plastics Recycling transactions. In the end, petitioners and their colleagues relied exclusively on PI, its personnel, and the offering materials as to the value and purported uniqueness of the machines.

In support of their contention that they acted reasonably, petitioners cite Mauerman v. Commissioner, 22 F.3d 1001 (10th Cir. 1994), revg. T.C. Memo. 1993-23. However, the facts in the Mauerman case are distinctly different from the facts of these cases. In Mauerman, the Court of Appeals for the Tenth Circuit held that the Commissioner had abused her discretion for not waiving a section 6661 addition to tax. Like the section 6659 addition to tax, a section 6661 addition to tax may be waived by the Commissioner if the taxpayer demonstrates that there was reasonable cause for his underpayment and that he acted in good faith. Sec. 6661(c). The taxpayer in Mauerman relied upon

independent attorneys and accountants for advice as to whether payments were properly deductible or capitalized. The advice relied upon by the taxpayer in <u>Mauerman</u> was within the scope of the advisers' expertise, the interpretation of the tax laws as applied to undisputed facts. In these cases, particularly with respect to valuation, petitioners relied upon advice that was outside the scope of expertise and experience of their purported advisers. Consequently, petitioners' reliance on the <u>Mauerman</u> case is rejected.

We hold that petitioners did not have a reasonable basis for the adjusted bases or valuations claimed on their tax returns with respect to their investments in the Partnerships. In these cases, respondent could find that petitioners' respective reliance on the offering materials and their colleagues was unreasonable. The records in these cases do not establish an abuse of discretion on the part of respondent but support respondent's position. We hold that respondent's refusal to waive the section 6659 additions to tax in these cases is not an abuse of discretion. Petitioners are liable for the respective section 6659 additions to tax at the rate of 30 percent of the underpayments of tax attributable to the disallowed tax benefits. Respondent is sustained on this issue.

C. Petitioners' Motions For Leave To File Motion For Decision
Ordering Relief From the Negligence Penalty and the Penalty Rate
of Interest and To File Supporting Memoranda of Law

Long after the trials of these cases, petitioners each filed a Motion For Leave To File Motion For Decision Ordering Relief From the Negligence Penalty and the Penalty Rate of Interest and To File Supporting Memorandum of Law under Rule 50. Petitioners also lodged with the Court motions for decision ordering relief from the additions to tax for negligence and from the increased rate of interest, with attachments, and memoranda in support of the motions. Respondent filed objections, with attachments, and memoranda in support thereof, and petitioners thereafter filed reply memoranda. Petitioners argue that they should be afforded the same settlement that was reached between other taxpayers and the IRS in docket Nos. 10382-86 and 10383-86, each of which was styled Miller v. Commissioner. See Farrell v. Commissioner, T.C. Memo. 1996-295 (denying a motion similar to petitioners' motions); see also Jaroff v. Commissioner, T.C. Memo. 1996-527; Gollin v. Commissioner, T.C. Memo. 1996-454; Grelsamer v. Commissioner, T.C. Memo. 1996-399; Zenkel v. Commissioner, T.C. Memo. 1996-398.

Counsel for petitioners seek to raise a new issue long after the trials in these cases. Resolution of such issue might well require new trials. Such further trials "would be contrary to

the established policy of this Court to try all issues raised in a case in one proceeding and to avoid piecemeal and protracted litigation." Markwardt v. Commissioner, 64 T.C. 989, 998 (1975); see also Haft Trust v. Commissioner, 62 T.C. 145, 147 (1974). Consequently, under the circumstances here, at this late date in the litigation proceedings, long after trial and briefing and after the issuance of numerous opinions on issues and facts closely analogous to those in these cases, petitioners' motions for leave are not well founded. Farrell v. Commissioner, supra.

Even if petitioners' motions for leave were granted, the arguments set forth in each of petitioners' motions for decision and attached memoranda, lodged with this Court, are invalid, and such motions would be denied. Therefore, and for reasons set forth in more detail below, petitioners' motions for leave shall be denied.

Some of our discussion of background and circumstances underlying petitioners' motions is drawn from documents submitted by the parties and findings of this Court in two earlier decisions. See Estate of Satin v. Commissioner, T.C. Memo. 1994-435; Fisher v. Commissioner, T.C. Memo. 1994-434. These matters are not disputed by the parties. We discuss the background matters for the sake of completeness. As we have noted, granting petitioners' motions for leave would require further proceedings.

The Estate of Satin and Fisher cases involved Stipulation of Settlement agreements (piggyback agreements) made available to taxpayers in the Plastics Recycling project, whereby taxpayers could agree to be bound by the results of three test cases: Provizer v. Commissioner, T.C. Memo. 1992-177, and the two Miller cases. We held in Estate of Satin and Fisher that the terms of the piggyback agreement bound the parties to the results in all three lead cases, not just the Provizer case. Petitioners assert that the piggyback agreement was extended to them, but they do not claim to have accepted the offer timely, so they effectively rejected it.[18]

In or about February of 1988, a settlement offer (the Plastics Recycling project settlement offer or the offer) was made available by respondent in all docketed Plastics Recycling cases, and subsequently in all nondocketed cases. Baratelli v. Commissioner, T.C. Memo. 1994-484. Pursuant to the offer, taxpayers had 30 days to accept the following terms: (1) Allowance of a deduction for 50 percent of the amount of the cash investment in the venture in the year(s) of investment to the

---

[18]    In each of their motions for decision, petitioners state, "After the lead counsel for taxpayers and Respondent had agreed upon the designation of the lead cases, Respondent's counsel prepared piggyback agreements and offered them to counsel for the taxpayers in this case and to other taxpayers." (Emphasis added.)

extent of loss claimed; (2) Government concession of the substantial understatement of tax penalties under section 6661 and the negligence additions to tax under section 6653(a)(1) and (2); (3) taxpayer concession of the section 6659 addition to tax for valuation overstatement and the increased rate of interest under section 6621; and (4) execution of a closing agreement (Form 906) stating the settlement and resolving the entire matter for all years.[19]  Petitioners assert that the Plastics Recycling project settlement offer was extended to them, but they do not claim to have accepted the offer timely, so they effectively rejected it.[20]

In December 1988, the <u>Miller</u> cases were disposed of by settlement agreement between the taxpayers and respondent.[21]

---

[19]     Although the records do not include a settlement offer to petitioners, petitioners have attached to their motions for decision a copy of a settlement offer to another taxpayer with respect to a plastics recycling case, and respondent has not disputed the accuracy of the statement of the plastics recycling settlement offer.

[20]     In each of their motions for decision, petitioners state, "Respondent formulated a standard settlement position <u>which was extended to all taxpayers</u> having docketed or non-docketed cases in the plastics recycling group, <u>including Petitioner</u>." (Emphasis added.)

[21]     Although it is not otherwise a part of the records in these cases, respondent attached copies of the <u>Miller</u> closing agreement and disclosure waiver to her objections to petitioners' motions
<span style="float:right">(continued...)</span>

This Court entered decisions based upon those settlements on December 22, 1988. The settlement provided that the taxpayers in the Miller cases were liable for the addition to tax under section 6659 for valuation overstatement, but not for the additions to tax under the provisions of section 6661 and section 6653(a). The increased interest under section 6621(c), premised solely upon Miller's interest in the recyclers for the taxable years at issue, was not applicable because Miller made payments prior to December 31, 1984, so no interest accrued after that time. Respondent did not notify petitioners or any other taxpayers of the disposition of the Miller cases. Estate of Satin v. Commissioner, supra; Fisher v. Commissioner, supra.

Petitioners argue that they are similarly situated to Miller, the taxpayer in the Miller cases, and that pursuant to the principle of "equality" they are therefore entitled to the same settlement agreement executed by respondent and Miller in those cases. In effect, petitioners seek to resurrect the piggyback agreement offer and/or the settlement offer they previously failed to accept.

---

[21](...continued)
for leave, and petitioners do not dispute the accuracy of the document.

Petitioners contend that under the principle of "equality," the Commissioner has a duty of consistency toward similarly situated taxpayers and cannot tax one and not tax another without some rational basis for the difference. United States v. Kaiser, 363 U.S. 299, 308 (1960) (Frankfurter, J., concurring); see Baker v. United States, 748 F.2d 1465 (11th Cir. 1984); Farmers' & Merchants' Bank v. United States, 476 F.2d 406 (4th Cir. 1973). According to petitioners, the principle of equality precludes the Commissioner from making arbitrary distinctions between like cases. See Baker v. Commissioner, 787 F.2d 637, 643 (D.C. Cir. 1986), vacating 83 T.C. 822 (1984).

The different tax treatment accorded petitioners and Miller was not arbitrary or irrational. While petitioners and Miller both invested in the Plastics Recycling project, their actions with respect to such investments provide a rational basis for treating them differently. Miller foreclosed any potential liability for increased interest in his cases by making payments prior to December 31, 1984. No interest accrued after that date. In contrast, petitioners made no such payment, and they conceded that the increased rate of interest under section 6621(c) applies in their cases. Liability for the increased rate of interest is the principal difference between the settlement in the Miller cases, which petitioners declined when they-failed to accept the

piggyback agreement offer, and the settlement offer that petitioners also failed to accept.

Petitioners argue that section 6621(c) must have been an issue in the Miller cases since each of the decisions in Miller recites "That there is no increased interest due from the petitioner[s] for the taxable years * * * [at issue] under the provisions of IRC section 6621(c)."  According to petitioners, "if the Millers were not otherwise subject to the penalty interest provisions because of the particular timing of their tax payments, there would have been no need for the Court to include such a recital in its decisions."  This argument by petitioners is entirely conjectural and is not supported by the documentation on which counsel relies.  In fact, the recital that no increased interest under section 6621(c) was due in the Miller cases was an express term of the settlement documents in those cases and apparently included in the decisions for completeness and accuracy.  There is nothing on the record in the present cases, or in the Court's opinions in Estate of Satin v. Commissioner, T.C. Memo. 1994-435, or Fisher v. Commissioner, T.C. Memo. 1994-434, or in any of the material submitted to us in these cases that would indicate that the Millers were "otherwise subject to the penalty interest provisions".  Petitioners' argument is based on a false premise.

We find that petitioners and Miller were treated equally to the extent they were similarly situated and differently to the extent they were not.  Miller foreclosed the applicability of the section 6621(c) increased rate of interest in his cases, while petitioners concede it applies in their cases.  Petitioners failed to accept a piggyback settlement offer that would have entitled them to the settlement reached in the <u>Miller</u> cases, and they also rejected a settlement offer made to them prior to trial of a test case.  In contrast, prior to trial Miller negotiated for himself and accepted an offer that was essentially the same as the Plastics Recycling project settlement offer that petitioners failed to accept prior to trial.  Accordingly, petitioners' motions are not supported by the principle of equality on which they rely.  Cf. <u>Baratelli v. Commissioner</u>, T.C. Memo. 1994-484.

In order to reflect the foregoing,

<u>Appropriate orders will be issued denying petitioners' motions, and decisions will be entered for respondent</u>.